**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

SHAUNPEN ZHOU,

           Plaintiff,

vs.

INTERNATIONAL BUSINESS
MACHINES CORPORATION,

           Defendant.

No. 15-CV-1027-LRR

**ORDER**

_____

### *TABLE OF CONTENTS*

**I.**      **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

**II.**     **RELEVANT PROCEDURAL HISTORY** . . . . . . . . . . . . . . . . . . . . . . . **2**

**III.**    **SUBJECT MATTER JURISDICTION** . . . . . . . . . . . . . . . . . . . . . . . **3**

**IV.**    **SUMMARY JUDGMENT STANDARD** . . . . . . . . . . . . . . . . . . . . . . . **4**

**V.**     **RELEVANT FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . **5**

        **A.**    *Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
        **B.**    *IBM and the Amtrak Team* . . . . . . . . . . . . . . . . . . . . . . . . . **6**
        **C.**    *Zhou's Employment* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
               *1.*     *Request for pay increase* . . . . . . . . . . . . . . . . . . . . . **9**
               *2.*     *Overtime* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**
               *3.*     *February 12, 2016 through Zhou's removal from IBM* . . . . . **14**

**VI.**    **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**

        **A.**    *Age Discrimination* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**
               *1.*     *Failure to hire* . . . . . . . . . . . . . . . . . . . . . . . . . . **23**
               *2.*     *Zhou's assignments and workload* . . . . . . . . . . . . . . . . **25**
               *3.*     *Application for pay raise* . . . . . . . . . . . . . . . . . . . . . **30**

    4.  *Underclaiming of hours* . . . . . . . . . . . . . . . . . . . . . . . . **33**
  **B.**  **FLSA Claim** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **34**
    1.  *Actual or constructive knowledge* . . . . . . . . . . . . . . . . . . . **36**
    2.  *Just and reasonable inference* . . . . . . . . . . . . . . . . . . . . . **43**
    3.  *Age discrimination* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **45**
  **C.**  **Retaliation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **46**

**VII.** **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **53**

## I. INTRODUCTION

The matters before the court are Defendant International Business Machines Corporation's ("IBM") Motion for Summary Judgment ("IBM Motion") (docket no. 102) and Plaintiff Shaunpen Zhou's "Resistance to Defendant IBM's Motion for Summary Judgment" ("Resistance") (docket no. 121), in which Zhou requests partial summary judgment.

## II. RELEVANT PROCEDURAL HISTORY

On April 8, 2016, Zhou filed an Amended Complaint (docket no. 52).[1] The Amended Complaint sets forth eleven claims: (1) Count I alleges that IBM violated the "Age Discrimination in Employment Act of 1967" ("ADEA"), 29 U.S.C. § 623, by failing to hire and promote Zhou; (2) Count II alleges that IBM and Artech Information Systems, LLC ("Artech") violated the ADEA by treating Zhou differently than his younger coworkers; (3) Count III alleges that IBM violated the ADEA by deliberately under-rating and underpaying Zhou; (4) Count IV alleges that IBM and Artech violated the ADEA by prohibiting Zhou from claiming overtime for hours worked; (5) Count V asserts that IBM and Artech violated the "Fair Labor Standards Act" ("FLSA"), 29 U.S.C. § 2, by prohibiting Zhou from claiming overtime for hours worked; (6) Count VI asserts that IBM

---

[1] At the time of the filing of the Amended Complaint, Zhou was represented by Stephen T. Fieweger. On September 28, 2016, the court discharged Fieweger as Zhou's counsel. *See* Sept. 27, 2016 Order (docket no. 80). Zhou is currently appearing pro se.

violated the ADEA by retaliating against him after he filed the instant action; (7) Count VII asserts that IBM violated the "Iowa Civil Rights Act" ("ICRA"), Iowa Code § 216.6, by failing to hire and promote Zhou; (8) Count VIII asserts that IBM and Artech violated the ICRA by treating Zhou differently than his younger coworkers; (9) Count IX asserts that IBM violated the ICRA by deliberately under-rating and underpaying Zhou; (10) Count X asserts that IBM and Artech violated the ICRA by prohibiting Zhou from claiming overtime for hours worked; and (11) Count XI asserts that IBM violated the ICRA by retaliating against him after he filed the instant action. On May 13, 2016, IBM filed an Amended Answer (docket no. 68), generally denying liability and setting forth affirmative defenses.

On December 15, 2016, Artech moved for summary judgment. *See generally* Artech Motion for Summary Judgment (docket no. 99). On December 16, 2016, IBM filed the IBM Motion. On January 23, 2017, at Zhou's request, the court dismissed Artech from the instant action. *See* Jan. 23, 2017 Order (docket no. 122). On that same date, Zhou filed the Resistance, requesting summary judgment in his favor on Counts III, VI, IX and XI of the Amended Complaint. On January 26, 2017, IBM filed a Reply ("Reply") (docket no.124). No party requests oral argument, and the court finds that oral argument is unnecessary. The Motions are fully submitted and ready for decision.

### III. SUBJECT MATTER JURISDICTION

The court has original jurisdiction over the ADEA and FLSA claims because they arise under the United States Code. *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). The court has supplemental jurisdiction over the ICRA claims because they are so related to the claims within the court's original jurisdiction that they form part of the same case or controversy. *See* 28 U.S.C. § 1367(a) ("[T]he district courts shall have supplemental jurisdiction over all other claims that are so related to claims in

the action within such original jurisdiction that they form part of the same case or controversy . . . ."). In other words, "the federal-law claims and state-law claims in the case 'derive from a common nucleus of operative fact' and are 'such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding.'" *Kan. Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs., Inc.*, 77 F.3d 1063, 1067 (8th Cir. 1996) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988)) (alteration in original) (quotation marks omitted).

## *IV. SUMMARY JUDGMENT STANDARD*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is proper 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show'" an absence of a genuine dispute as to a material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Fed. R. Civ. P. 56(c)(2)). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)). "The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson*, 643 F.3d at 1042 (alterations in original) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the movant has done so, "the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 324).

On a motion for summary judgment, the court must view the facts "in the light most favorable to the nonmoving party . . . ." *Id.* (quoting *Ricci v. DeStefano*, 557 U.S.

557, 586 (2009)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial," and summary judgment is appropriate. *Ricci*, 557 U.S. at 586 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "The nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts' . . . ." *Torgerson*, 643 F.3d at 1042 (quoting *Matsushita*, 475 U.S. at 586). Instead, "[t]o survive a motion for summary judgment, the nonmoving party must substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy." *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011) (second and third alterations in original) (internal quotation marks omitted) (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 733-34 (8th Cir. 2003)). Mere "self-serving allegations and denials are insufficient to create a genuine issue of material fact." *Anuforo v. Comm'r of Internal Revenue*, 614 F.3d 799, 807 (8th Cir. 2010).

## V.  RELEVANT FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to the nonmoving party and affording him all reasonable inferences, the uncontested material facts are as follows.

### A.  Parties

Zhou is an individual who resided in the State of Iowa at the time the instant action was initiated.[2] Amended Complaint ¶ 12. Zhou was jointly employed by IBM and Artech until his termination. *See id.* ¶¶ 13-14. IBM is a corporation headquartered in Armok, New York. *Id.* ¶ 13. IBM operates a "Client Innovations Center" in Dubuque, Iowa. "IBM's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment" ("IBM Statement of Facts") (docket no. 102-1) ¶ 1.

---

[2] In January of 2016, Zhou relocated to Quincy, Massachusetts. Amended Complaint ¶ 12.

## B. IBM and the Amtrak Team

Among IBM's various teams working from the Dubuque location is the Amtrak team. *Id.* ¶ 6. The Amtrak team is responsible for providing a variety of technical services for the passenger railroad service Amtrak, including "operating system software maintenance, operating system software trouble shooting and repair" as well as "ad-hoc end user and other miscellaneous questions." *See id.* ¶ 15. Systems administrators on the Amtrak team are tasked with server "patching," or "the installation of changes or upgrades to the server environment, including security and service-related changes." *Id.* ¶ 16. Because the server must be taken offline to complete a patching assignment, so-called "change windows," a period of time "during which the change or patch could be applied," are generally scheduled over nights and weekends. *Id.* ¶¶ 16, 17. During the period relevant to his action, Zhou was a systems administrator on the Amtrak team, working at the Dubuque location. *Id.* ¶¶ 5, 6.

Artech is one of several temporary staffing firms with whom IBM contracts, and the Amtrak team includes several members placed by Artech. *See id.* ¶¶ 2, 4. Zhou was placed at IBM on the Amtrak team by Artech. *Id.* ¶¶ 5, 6. IBM would pay Artech for the use of temporary employee's services and, in turn, Artech would pay such employees' wages. Artech employed a Service Delivery Manager at the Dubuque facility, Sarah Lynch, to whom Zhou reported. *Id.* ¶ 11.

IBM technicians fall into one of several levels, which corresponds to the complexity of their job duties and their pay. "Rhythm" is the lowest technical level, "Blues" follows, and "Jazz" represents the highest level. *See* IBM Statement of Facts ¶¶ 19, 20; *see also* IBM Supplemental Appendix (docket no. 124-2) at 36-41. In early 2014, IBM received unfavorable feedback from Amtrak regarding the team's communication skills. *See* IBM Statement of Facts ¶ 36. In response, the IBM team leader assigned to Amtrak proposed the creation of new positions, "Subject Matter Experts" ("SME"). *Id.* Three such

positions were posted in 2014, and were communicated to the Amtrak team on May 20, 2014. *Id.* ¶¶ 36, 38. According to IBM management, the ideal candidate for the SME position was "someone who could remain calm and professional when the customer was yelling, explain technical concepts so that people of varying levels of technical knowledge could understand, and could think and speak on their feet in stressful situations." *Id.* ¶ 37. Two of these SME positions were eventually filled by Mikhail Matveyev, who had previously been a temporary employee like Zhou, and Brendan Lloyd. *Id.* ¶¶ 39-41.

System administrators generally reported to team leads, including the UNIX and Intel Team Lead, to whom Zhou reported. During the relevant time period, the UNIX and Intel team leads were: Robert Howe from Zhou's hiring until the Fall of 2013; Heather Majerus from Fall of 2013 through April of 2015; and David Fawcett from April of 2015 through Zhou's removal from his IBM placement. *See id.* ¶ 12; *see also* IBM Appendix I[3] at 55, 67. In turn, team leads reported to a First Line Manager. *See* IBM Statement of Facts ¶ 12. During Zhou's time with IBM, there were three First Line Managers: William Thompson from February of 2013 through February of 2014; Heather Chumbley from February 2014 through August of 2014; and Jeff Segerstrom from August of 2014 through February 22, 2016. *Id.* ¶ 11.

At all relevant times, IBM maintained an official overtime policy that reads as follows: "All hours in excess of [forty] hours worked, exclusive of the employee meal breaks, during an employee's regular payroll workweek will be considered as weekly overtime hours. . . . Time and one-half (1.5x base hourly rate) will be paid for hours worked over [forty] for the week." IBM Appendix II at 147-48. Zhou was aware of IBM's overtime policy and consulted IBM's overtime policy during his placement at IBM.

---

[3] IBM has filed its appendix in support of the IBM Motion in two parts. As used in this order, "IBM Appendix I" shall refer to docket no. 102-4 and "IBM Appendix II" shall refer to docket no. 102-5.

*See* IBM Statement of Facts ¶¶ 61, 62. Similarly, Artech maintains an overtime policy that reads as follows: "The law says that you cannot waive overtime compensation. When you are authorized to work overtime—over [forty] hours per week—you will be paid time-and-a-half for work after forty hours." IBM Appendix II at 156. As with IBM's policy, Zhou was aware of and read Artech's overtime policy. *See* IBM Statement of Facts ¶¶ 64, 65.

Additionally, IBM managers receive training on the law surrounding overtime. In particular, managers are trained that the right to overtime is governed by state and federal law; overtime cannot be waived; even if an employee works overtime without permission, the employee is normally paid for such hours; and "if an employee's task takes him or her over scheduled hours, he or she should still record that time, and IBM will pay that employee for the time worked, even if prior authorization was not received." *See* IBM Appendix I at 123-128, 153-158. IBM has an online tool for reporting overtime hours, which permanent employees and temporary employees like Zhou are directed to use. *See* IBM Statement of Facts ¶ 67.

### C. Zhou's Employment

On November 26, 2012, Zhou and Artech entered into an employment agreement. *Id.* ¶ 3; *see also* IBM Appendix II at 124-132. The employment agreement with Artech set Zhou's regular compensation at $40.00 per hour and overtime compensation at $60.00 per hour. *See* IBM Appendix II at 130. In approximately March of 2013, Artech placed Zhou with IBM as a temporary employee at its Dubuque location. IBM Statement of Facts ¶ 5. Zhou was placed as a UNIX Systems Administrator with the Amtrak Team. *Id.* ¶ 6. Zhou was placed at IBM as the lowest level technician, equivalent to the "Rhythm" level for an IBM permanent employee. *Id.* ¶ 19. At IBM, Zhou primarily reported to the UNIX and Intel Team Lead. *See id.* ¶ 12. He would receive assignments that had to be completed within certain change windows, but it was up to employees to finish the

8

assignments within the forty regular hours allotted for the week, or request overtime to complete such assignments. *See, e.g.*, IBM Appendix II at 89.

At IBM, Zhou was one of the most technically skilled systems administrators on the team and was regularly assigned the most technically challenging assignments. *See* Zhou Affidavit (docket no. 121-3) ¶ 9. He was praised on several occasions for his technical prowess. *See* Zhou Statement of Facts (docket no. 121-2) ¶¶ 10-16. Shortly after joining the Amtrak team, Zhou uncovered a faulty practice in the way that IBM was patching Amtrak's servers. *See* Zhou Affidavit ¶ 11. For this reason, IBM assigned him the task of patching the Amtrak servers, resulting in heavy workloads and extreme hours to complete his assignments. *See, e.g.*, *id* ¶¶ 20, 24, 25.

### 1.     *Request for pay increase*

On or about February 24, 2014, Zhou contacted Lynch to formally request reclassification to a higher skill level and a pay increase. *See* IBM Statement of Facts ¶ 47. Zhou's request would increase Zhou's hourly cost to IBM by $8.76 for regular time and $14.16 for overtime. *Id.* ¶¶ 48-49. Such additional cost to IBM would then be reflected in Zhou's wages from Artech. Lynch passed Zhou's request on to Chumbley. *Id.* ¶ 47.

On April 9, 2014, Chumbley emailed Kim Mattox, Chumbley's Senior Manager and Service Integration Leader, and stated:

> Are you interested in bringing this forward to raise Shaunpen's rate in an effort to retain him? I can't afford to lose him now, but with his communication problems (coming across as argumentative with the customer on the line, with his team lead and me). I have been keeping him on patching with help from Brian on the ecab calls to keep him from communicating with Amtrak as much as possible.

IBM Appendix II at 21; *see also* IBM Statement of Facts ¶ 50. Ultimately, on June 12, 2014, Chumbley replied to Lynch and another Artech representative and stated:

> While Shaunpen does have some useful skills, my team leads
> and I continue to have trouble getting Shaunpen to take
> direction without significant argument. He frequently is
> argumentative when our client asks him to do things as well.
> For these reasons, I would not support an increase in rate for
> Shaunpen.

IBM Appendix II at 27. Accordingly, Zhou was denied a pay increase.

## 2. *Overtime*

IBM made regular attempts to inform Zhou and the other employees, both temporary and permanent, of IBM's overtime policies.[4] Periodically, IBM restricted the availability of overtime hours that employees could work as a cost-control measure. *See* IBM Statement of Facts ¶ 76. Other times, IBM was less restrictive of the amount of overtime that its employees could work. However, at all times, employees were required to report all hours worked including overtime, regardless of whether they received preapproval. *See, e.g.*, IBM Appendix I at 120. IBM took measures to ensure that its employees were aware of the overtime requirements as detailed below.

For example, on August 16, 2013, Thompson sent an email stating that "no [overtime] is to be worked without prior written approval." IBM Appendix I at 131. In mid-November of 2013, Thompson and Majerus had a meeting with Zhou and stated that no overtime was a rule and reminded Zhou that he was a contractor and he could be replaced at any time. *See* Amended Complaint ¶ 83. At that time, Thompson also directed Zhou to accurately claim all hours worked. *See* IBM Statement of Facts ¶ 76. After the meeting, Majerus sent Zhou an email that stated the following:

> I would like to reiterate to you that it has been made clear by
> [Thompson] as well as . . . [m]yself that claim[s] need to be

---

[4] With respect to overtime, IBM appeared to apply its overtime procedures equally to its own employees and employees of staffing firms like Artech, of which Zhou was one. Therefore, with respect to overtime, where the court or the record refers to an "employee" the court will assume that it applies to permanent and temporary employees alike.

> 100% accurate. . . . You are provided assignments on a
> weekly basis and your [forty] hours needs to be allocated and
> scheduled out as such. The expectation is that you work
> [forty] hours per week unless you have an approval for
> overtime. . . . There can be no exception to accuracy of
> claim[s].

IBM Appendix II at 89. Zhou responded to Majerus later that evening, stating that he had never over-claimed hours and that he could not predict how long his nightly patching changes would take. *Id.* at 88. Zhou further stated that, if the patching changes took longer than expected, he would simply claim eight hours. *Id.*

On March 14, 2014, Chumbley emailed Zhou and CC'ed Lynch, stating:

> I do not want you to claim your hours different than what you
> work. You must claim exactly what you work. . . . Overtime
> must be pre-approved before you work it. . . . We (your
> manager, team lead, change coordinator, and dispatcher) do
> not have the technical expertise to know if we are scheduling
> too much or too little work for you. We need you to review
> your changes one or two weeks ahead to make sure that you
> will not have too much work to fit in a [forty] hour week.

*Id.* at 29-30. Chumbley separately emailed Lynch, informing her that she had orally related the substance of the email to Zhou but "wasn't sure he got it." *Id.* at 32. Chumbley also informed Lynch: "He keeps saying he's willing to work without claiming and I want to make sure he knows that I don't want him to do that." *Id.* at 32. On April 25, 2014, Chumbley again emailed Zhou, stating:

> It has come to my attention that you worked over [forty] hours
> this week. . . . I want you to tell us if we are scheduling you
> for too much work. If someone is asking you to do work that
> will put you over [forty] hours, with the changes that you have
> already scheduled, you need to tell them that. . . . I cannot
> keep track of how many hours everyone on the team has spent.

*Id.* at 29.

During Zhou's time on the Amtrak team, he claimed and was paid overtime hours for half of the weeks that he worked. *See* IBM Statement of Facts ¶¶ 90-91; *see also* IBM Appendix II at 181-95. In total, Zhou reported and was paid for over 575 hours of overtime. *See* IBM Statement of Facts ¶¶ 91-92; *see also* IBM Appendix I at 41 (Zhou deposition testimony stating that IBM paid him what he claimed).

IBM periodically inquired into Zhou's overtime hours. When Zhou grew close to reaching his regular-time hours for the week, IBM would either authorize him to work overtime, or ask him to stop working so that he did not exceed his forty regular-time hours. *See, e.g.*, IBM Appendix II at 38 (instant message conversation between Chumbley and Zhou wherein Chumbley asks Zhou "to leave early [the next day] to keep it to [forty] hours total for the week" and Zhou agreed); IBM Appendix II at 44 (email from Chumbley to a project manager stating that "Shaunpen is out of hours for the week and [she had] decided not to request overtime for him"); IBM Appendix II at 99 (instant message conversation between Zhou and Majerus wherein Majerus directs Zhou to not work any more during that week because he had already worked thirty-eight hours and, after being called in for an emergency began compiling overtime hours); IBM Appendix II at 107 (instant message conversation between Zhou and Majerus wherein Majerus instructs Zhou to take the weekend off once he reached forty hours and reminds him that any additional time should be claimed as overtime). On several occasions, Zhou refused to fully disclose how much overtime he had worked until prompted by Majerus. *See id.* at 65 (instant message conversation between Majerus and Zhou wherein Majerus inquired as to the amount of overtime Zhou worked for the week, and Zhou stated "[t]his week [three] hours OT" and then confessed to five hours after Majerus asked "thats [sic] it? are you sure?"). For example, on May 8, 2014, Majerus and Zhou had the following instant message conversation:

> [Majerus:]    Shaunpen, I need to know how many hours you
>                have worked for the week and with your change

|  |  | tomorrow night how much OT will you need so I can get it approved |
|---|---|---|
| [Zhou:] | | for [a change] I think need 1 hour --- 30 min for the noon conference call ; 30 min for night change [sic] |
| . . . | | |
| [Majerus:] | | But you have worked every day since Saturday so I know I owe you more than that. I need you to include all your hours and tell me where you are |
| . . . | | |
| [Zhou:] | | . . . If could , then I say 8 hours OT this week plus tomorrow what ever will happen |
| [Majerus:] | | right. Thats [sic] how you are supposed to do it. Thank you . Right now I will ask for 15 hours of OT for you , so if tomorrow is a long day and then you have your night stuff too. You claim as much of it as you end up needing. Its [sic] very important to do it correctly. Thanks for your help |

*Id.* at 95.

It was Zhou's practice to simply claim that he worked forty hours per week on his time sheets, even though he regularly worked over seventy overtime hours. *See* IBM Statement of Facts ¶ 112; *see also* IBM Appendix I at 66 (Zhou deposition testimony stating that he "always claim[ed] less than [he] worked"). Zhou did not ever "keep notes or any kind of a record on a calendar or anything else about how many hours [he] worked on any . . . day" because he claims he was too busy and did not have time to do so. IBM Appendix I at 38. Zhou did not claim all the overtime hours he worked because he feared being reprimanded for claiming too much overtime, due to IBM's sometimes restrictive overtime policy. *See id.* at 82. However, Zhou also admits that he "never got in trouble" for claiming overtime. *Id.* It was Zhou's practice to claim about half the overtime that

he worked in a given week, though such calculations were approximations. *See id.* at 83; *see also* IBM Statement of Facts ¶¶ 70-72.

### 3.     *February 12, 2016 through Zhou's removal from IBM*

Zhou was assigned to a particular project on the evening of February 11, 2016, that required him to work through the early morning of February 12, 2016. *See* IBM Statement of Facts ¶ 113. The project required Zhou to patch one of Amtrak's servers. His customer contact for the project was Warren Enszer, an Amtrak employee who had previously worked for IBM and reported to Segerstrom. *Id.*

On Friday, February 12, 2016, at 3:11 a.m., Enszer sent Segerstrom the following email:

> Jeff,
>
> I'm not sure if Shaunpen reports to you, but I'm hoping you can help so that we can get this process and behavior straightened out for future changes. I worked with Shaunpen on this change tonight, and I had a very difficult time working with him. I experienced what I believe to be quite unprofessional behavior. . . .
>
> I believe Shaunpen should have been directing this change. I never saw an email from him without first contacting him myself. . . . After I removed the blackout, I noticed that there were some root file system alerts. These are not owned by us. As a courtesy, I let him know about these, and he began yelling at me and arguing with me that I or the application owners should be opening tickets for these.
>
> We need to get this process nailed down, unless this is just a Shaunpen thing.

IBM Appendix I at 164. At 4:36 a.m., John Gardiner, Enszer's supervisor at Amtrak, emailed Segerstrom and included Enszer's earlier email, stating: "Jeff, please call me about this change." IBM Supplemental Appendix at 53. Segerstrom called Gardiner just after 6:00 a.m. and, during the phone call, Gardiner requested higher level

technicians—above Zhou's level—to resolve the issue with the Amtrak server. *See* IBM Statement of Facts ¶ 115. Later that morning, at 11:31 a.m., Segerstrom responded to Enszer and stated the following:

> Warren, yes Shaunpen does report to me and I will address this issue. Thank you for bringing this to my attention. Shaunpen has always had what seems to be almost rude behavior but that has just been his commincation style and his intent was never to be rude. In fact he is Marilyn's favorite patcher but what your [sic] describing sounds beyond the norm for his behavior. I do apologize and I will handle. Thanks.

Zhou Appendix I[5] at 83.

Segerstrom determined that he would request that Artech remove Zhou from placement at IBM. *See* IBM Statement of Facts ¶ 120. However, because Segerstrom was out of the office on February 12, he was not able to communicate with IBM's human resources leader until Monday, February 15, 2016. *Id.* ¶ 121. At that time, human resources stated that the request was being forwarded for approval, and Segerstrom took no immediate further action with regard to Zhou. *Id.* ¶¶ 121-22. Segerstrom received approval to request Zhou's removal from his IBM placement on Thursday, February 18, 2016. *Id.* ¶ 123. The approval stated that he could inform Artech of IBM's request on Friday, February 19, 2016. *Id.* ¶ 123. On February 19, 2016, Zhou served his initial disclosures in the instant case. *Id.* ¶ 125. Segerstrom informed Artech of IBM's request for Zhou's removal on Monday, February 22, 2016, and Zhou was removed from the IBM placement later that day. *Id.* ¶ 124, *see also* Zhou Appendix I at 95-96.

---

[5] Zhou has filed his appendix in support of the Resistance in two parts. As used in this order, "Zhou Appendix I" shall refer to docket no. 121-4 and "Zhou Appendix II" shall refer to docket no. 121-5.

## VI.  ANALYSIS

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  The ADEA also makes it unlawful for an employer "to discriminate against any individual . . . because such individual . . . has opposed any practice made unlawful by [the ADEA], or because such individual . . . has made a charge . . . or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d).  In this way, the ADEA prohibits employment discrimination based on age and prohibits retaliation for engaging in protected activity related to allegations of age discrimination.

Similarly, the ICRA makes it unlawful to discriminate against an individual on the basis of age in the employment context.  *See* Iowa Code § 216.6(1)(a).  The ICRA also prohibits retaliation "against another person in any of the rights protected against discrimination by this chapter because such person has . . . filed a complaint, testified, or assisted in any proceeding under this chapter." *Id.* § 216.11(2).  Zhou has brought discrimination and retaliation claims under the ADEA (Counts I-IV, VI) and under the ICRA (Counts VII-XI).

Under both the ADEA and the ICRA, a plaintiff may either offer direct evidence of discrimination or prove his case through indirect evidence of discrimination under the burden shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 855-56 (8th Cir. 2012).  "Direct evidence of discrimination must show 'a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action.'" *Hutton v. Maynard*, 812 F.3d 679, 683 (8th Cir. 2016) (quoting

*Russell v. City of Kan. City*, 414 F.3d 863, 866 (8th Cir. 2005)). Such evidence "encompasses comments or statements indicating discriminatory intent, where those comments are made by people with decision-making authority." *Id.* The same analysis applies with respect to claims of retaliation. Here, Zhou has not alleged direct evidence of discrimination or retaliation. Accordingly, to prevail on his claims, Zhou must demonstrate the existence of a genuine dispute of material facts regarding indirect evidence of discrimination or retaliation.

Under the *McDonnell Douglas* burden-shifting framework, the initial burden rests on the plaintiff to establish a prima facie case of discrimination. *See Gibson*, 670 F.3d at 856. Once a plaintiff has done so, "the burden shifts to [the employer] to provide a legitimate, nondiscriminatory reason for the [adverse employment action]." *Id.* (alterations in original) (quoting *Haigh v. Gelita USA, Inc.*, 632 F.3d 464, 468 (8th Cir. 2011)). "Finally, if [the employer] provides such a reason, the burden returns to [the plaintiff] to prove [the employer's] reason was mere pretext for discrimination." *Id.* (alterations in original). "At all times, the plaintiff retains the burden of persuasion to prove that age was the . . . cause of the termination." *Hilde v. City of Eveleth*, 777 F.3d 998, 1004 (8th Cir. 2015) (quoting *Rahlf v. Mo-Tech Corp.*, 642 F.3d 633, 637 (8th Cir. 2011)). The same analysis applies to claims of retaliation.

The FLSA is designed to protect employees' rights to not work in "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). "It does so in part by setting forth substantive wage, hour, and overtime standards." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 11 (2011). The FLSA provides that, unless one of several exemptions applies, "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half

times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The Eighth Circuit Court of Appeals has warned that exemptions to the FLSA's overtime provision should be strictly construed and that remedial provisions should be given "[a] generous reading, in favor of those whom [C]ongress intended to benefit from the law." *Kelley v. Alamo*, 964 F.2d 747, 750 (8th Cir. 1992); *see also Nw. Airlines v. Jackson*, 185 F.2d 74, 77 (8th Cir. 1950) ("[T]he Fair Labor Standards Act . . . should be strictly construed to the end that . . . exemption[s] will not be enlarged beyond [their] necessary exten[t] and in order that the Act will accomplish as fully as possible the remedial purposes for which it was designed."). "An employee who sues for unpaid overtime 'has the burden of proving that he performed work for which he was not properly compensated.'" *Holaway v. Stratasys, Inc.*, 771 F.3d 1057, 1059 (8th Cir. 2014) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946), *superseded by statute on other grounds*). Zhou has brought a single claim for unpaid overtime under the FLSA (Count V).

Initially, the court notes that Zhou was technically an employee of Artech, not IBM. The Equal Employment Opportunity Commission ("EEOC") has released enforcement guidance that squarely addresses this issue. *See* EEOC, No. 915.002, Enforcement Guidance: Application of EEO Laws to Contingent Workers Placed by Temporary Employment Agencies and Other Staffing Firms (1997), *available at* https://www.eeoc.gov/policy/docs/conting.html. The EEOC states that "[t]he staffing firm and/or its client will qualify as the worker's employer(s) if . . . one or both businesses have the right to exercise control over the worker's employment." *Id.* The EEOC further states that "[a] client of a temporary employment agency typically qualifies as an employer of the temporary worker during the job assignment, along with the agency. This is because the client usually exercises significant supervisory control over the worker."[6] *Id.*

_____

[6] The EEOC Enforcement Guidance defines a temporary employment agency as one
(continued…)

In the Title VII context, the Eighth Circuit has stated that "nothing in the law precludes the possibility that a person may have two or more employers for the same work." *Hunt v. State of Mo., Dep't of Corrections*, 297 F.3d 735, 742 (8th Cir. 2002). Under the ADEA, courts employ a common law test to determine a worker's employment status, and such issue is a question of law, "and therefore 'may often be decided by the court on a summary judgment record.'" *Alexander v. Avera St. Luke's Hosp.*, 768 F.3d 756, 761-62 (8th Cir. 2014) (quoting *Ernster v. Luxco, Inc.*, 596 F.3d 1000, 1006 (8th Cir. 2010)). The common law test rests on the

> hiring party's right to control the manner and means by which the product [of work] is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24 (1992) (quoting *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52 (1989)).

Examining the factors above, the court concludes that both Artech and IBM were Zhou's employers for purposes of his civil rights claims. Although Zhou signed an

---

[6](…continued)
who "recruits, screens, hires, and sometimes trains its employees. It sets and pays the wages when the worker is placed in a job assignment . . . [and] bills the client for the services performed." *Id.* Additionally, "the client typically controls the individual's working conditions, supervises the individual, and determines the length of the assignment." *Id.* Under the EEOC's definition, the court will consider Artech to be a temporary employment agency.

employment agreement with Artech alone, and Artech paid his wages, IBM exercised significant control over every other aspect of Zhou's employment. IBM controlled Zhou's work assignments and when such assignments were to be completed, provided him equipment and a workspace and determined when his assignment would end. The court's conclusion aligns with the majority of other courts that have addressed this issue and the EEOC enforcement guidance. *See Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 415 (4th Cir. 2015) (concluding that both a temporary staffing agency and the manufacturer at which a plaintiff was placed by such agency were the plaintiff's employers because the manufacturer maintained a significant degree of control over the day-to-day terms of the plaintiff's employment and the staffing agency paid, disciplined and terminated the plaintiff); *Johnson v. Manpower Prof'l Servs., Inc.*, 442 F. App'x 977, 982 (5th Cir. 2011) (holding that a staffing agency's client was the plaintiff's employer for purposes of the plaintiff's Title VII claims, even though the staffing agency paid the plaintiff and controlled her placement at the client, because the client so completely controlled the terms and conditions of the plaintiff's work); *McQueen v. Wells Fargo Home Mortg.*, 955 F. Supp. 2d 1256, 1279-80 (N.D. Ala. 2013) (finding that both the temporary staffing agency and client were an ADEA and Title VII plaintiff's employers); *see also Ash v. Anderson Merchs., LLC*, 799 F.3d 957, 961 (8th Cir. 2015) (directing courts to consider the "economic realit[ies]" of a relationship between a putative employer and employee to determine the hired party's employment status). *But see Scott v. UPS Supply Chain Sols.*, 523 F. App'x 911, 912-13 (3d Cir. 2013) (applying the *Darden* factors and concluding that a plaintiff who was paid by, formally employed by and remained under formal employment of a staffing agency rather than the staffing agency's client, was solely an employee of the staffing agency). Additionally, the court notes that IBM does not contend that it is entitled to summary judgment specifically on these grounds. Accordingly, the court finds that IBM

was one of Zhou's employers for purposes of his ADEA and FLSA claims and will not grant summary judgment in IBM's favor on these grounds.

The court shall proceed to analyze Zhou's discrimination claims, retaliation claims and FLSA claim separately.

## A. Age Discrimination

To establish a prima facie case of age discrimination under the ADEA, a plaintiff must demonstrate that he: "'(1) is a member of a protected class, (2) was qualified, (3) suffered an adverse employment action, and (4) can provide facts that give rise to an inference of unlawful . . . discrimination' on the basis of a protected class status." *Blackwell v. Alliant Techsystems, Inc.*, 822 F.3d 431, 435 (8th Cir. 2016) (alterations in original) (quoting *Robinson v. Am. Red Cross*, 753 F.3d 749, 754 (8th Cir. 2014) (analyzing claims of race, gender and age discrimination). "To create an inference that the decision to [take an adverse employment action] was based on unlawful discrimination, a plaintiff may show pretext by such evidence as an employer failing to 'follow its own policies' or treating 'similarly-situated employees in a disparate manner.'" *Id.* (quoting *Young v. Builders Steel Co.*, 754 F.3d 573, 578 (8th Cir. 2014)). Generally, courts analyze age discrimination claims arising under the ADEA and the ICRA identically. *See Tusing v. Des Moines Indep. Cmty. Sch. Dist.*, 639 F.3d 507, 514 (8th Cir. 2011). The only distinction between the two analyses is the standard of proof required to prove a plaintiff's case. Under the ADEA, a plaintiff is required to prove that age was a "but for" cause for the adverse employment action. *See id.* (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009)). However, under the ICRA, a plaintiff need only demonstrate that age was a "motivating factor" in the employer's decision. *See id.* (quoting *DeBoom v. Raining Rose, Inc.*, 772 N.W.2d 1, 12-13 (Iowa 2009)). "In a 'pretext' case . . . the Iowa Supreme Court's interpretation of the ICRA arguably creates a lower standard than the Supreme Court's interpretation of the ADEA." *Id.* at 514-15.

IBM does not dispute that Zhou is in a protected class, nor does it appear to dispute that Zhou was qualified for the position for which he was hired. IBM argues that summary judgment in its favor is appropriate on all of Zhou's discrimination counts because there is no evidence that age was a factor in its failure to hire him as a permanent employee, its scheduling him for an allegedly heavier workload than his coworkers, in its decision not to pay Artech more for his services and to rate him equivalent to a Rhythm level technician or in allegedly forcing him to underclaim hours worked. *See* Brief in Support of the IBM Motion (docket no. 102-2) at 8-16. Zhou argues that he is entitled to summary judgment on his claim that IBM discriminated against him by deliberately under-rating his skill level and refusing to raise his pay rate. *See* Resistance at 15-30.

As an initial matter, IBM argues that none of Zhou's claims of age discrimination are cognizable because "he is not complaining of *age* discrimination at all" and is instead complaining of an "alleged lack of job mobility" that is merely "*correlated* with age." *See* Brief in Support of the IBM Motion at 8-9. In *Hazen Paper Co. v. Biggins*, the Supreme Court held that, where an employer takes an adverse action against an employee on the basis of a factor that is merely correlative with age, rather than on the basis of "age as a proxy for [a plaintiff's] remaining characteristics" such an action would fall outside of the ADEA's purview. *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993). Thus, for example, an employer may terminate an individual to prevent his or her pension benefits from vesting and not violate the ADEA, even though pensions generally vest after an individual has worked for an employer for a certain number of years, making it more likely that individuals whose pensions are about to vest will be older. *See id.*

However, the ADEA itself is based upon the premise that "older workers find themselves disadvantaged . . . especially to regain employment when displaced from jobs." 29 U.S.C. § 621(a)(1). Zhou claims that IBM discriminated against him because it knew that his age made his ability to find a different job more difficult, such that he would

endure discriminatory treatment in his current job. The court believes than an employer, genuinely motivated by the belief that an older individual will not complain of unfair treatment or will not leave their job after being overworked, should not be shielded from scrutiny under the ADEA when the ADEA was enacted to remedy these exact harms. Accordingly, the court assumes that Zhou may proceed with this case and declines to grant the IBM Motion on these grounds. Instead, the court shall address each of Zhou's alleged bases for discrimination separately.

### 1.    Failure to hire

A plaintiff alleging a discriminatory failure to hire must establish a slightly different prima facie case than one merely alleging disparate treatment. "A prima facie case of age discrimination under the ADEA in a failure to hire context requires showing that (1) the plaintiff was in the protected age group (over forty), (2) the plaintiff was otherwise qualified for the position, (3) the plaintiff was not hired, and (4) the employer hired a younger person to fill the position." *Chambers v. Metro. Prop. & Cas. Ins. Co.*, 351 F.3d 848, 856 (8th Cir. 2003). "Courts have generally recognized . . . that 'failure to formally apply for a job opening will not bar a . . . plaintiff from establishing a prima facie claim, . . . as long as the plaintiff made every reasonable attempt to convey his interest in the job to the employer.'" *Chambers v. Wynne Sch. Dist.*, 909 F.2d 1214, 1217 (8th Cir. 1990) (quoting *Equal Emp't Opportunity Comm'n v. Metal Serv. Co.*, 892 F.2d 341, 348 (3d Cir. 1990)). Courts have also "observed that plaintiffs in discrimination actions have been excused from applying for promotions if the job opening was not officially posted or advertised and either . . . the plaintiff had no knowledge of the job from other sources until it was filled, or . . . the employer was aware of the plaintiff's interest in the job notwithstanding the plaintiff's failure to make a formal application." *Lockridge v. Bd. of Trs. of Univ. Of Ark.*, 315 F.3d 1005, 1011 (8th Cir. 2003) (alterations in original)

(internal quotation marks and emphasis omitted) (quoting *Chambers v. Wynne Sch. Dist.*, 909 F.3d at 1217).

Zhou claims that IBM's failure to hire him for the SME position created in 2014 was discriminatory. IBM argues that it is entitled to summary judgment on Zhou's claims of discriminatory failure to hire because the evidence demonstrates that Zhou's age was not a factor in its decision not to hire him and because Zhou failed to apply for the position. *See* Brief in Support of the IBM Motion at 10. Zhou argues that IBM is not entitled to summary judgment because his employment agreement with Artech, as well as the Master Services Technical Agreement between Artech and IBM, prevent an Artech employee from applying for permanent employment with IBM without the permission of his supervisors. *See* Resistance at 48.

Zhou does not point to any evidence in the record that he was verbally prohibited from applying for a permanent position at IBM. Instead, he relies on his independent reading of the employment agreement and Master Services Technical Agreement. *See* Response to IBM Statement of Facts (docket no. 121-1) ¶¶ 38, 41, 42, 44. The documentary evidence on which Zhou relies flatly contradicts his argument. Section 8(a) of Zhou's employment agreement with Artech merely serves to prevent Zhou from soliciting IBM for contract business on behalf of himself or another staffing firm. *See* IBM Appendix II at 125; *see also* Reply at 4. Similarly, Section 6.1.3 of the Master Technical Services Agreement merely states that Artech employees will not participate in IBM's benefits plans. *See* Zhou Appendix II at 99; *see also* Reply at 4. Nothing about these two contractual provisions suggests that Zhou would not be permitted to apply for the SME position, and such provisions are amenable to interpretation as a matter of law. *See Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 435-36 (Iowa 2008) ("Interpretation of a contract is a legal issue unless the interpretation of the contract depends on extrinsic evidence. . . . We always review the construction of a contract as a legal issue.").

Additionally, IBM has advanced evidence that the positions were electronically posted and advertised. *See* IBM Appendix II at 11-13. Thus, Zhou cannot fulfill the first part of the inquiry in *Lockridge*. *See Lockridge*, 315 F.3d at 1011. Furthermore, there is no evidence that Zhou made "every reasonable attempt to convey his interest in the job" to IBM. *Chambers v. Wynne Sch. Dist.*, 909 F.2d at 1217. Zhou has advanced no evidence, and the court is aware of none, that he communicated his interest in the SME position to anyone at IBM or Artech, either verbally or in writing. Therefore, Zhou has not demonstrated the existence of a genuine issue of material fact regarding IBM's failure to hire him.[7] Accordingly, the court shall grant the IBM Motion with respect to Counts I and VII.

### 2. *Zhou's assignments and workload*

Zhou alleges that IBM discriminated against him by assigning him to a heavier workload than other employees. IBM argues that it is entitled to summary judgment on these claims because there is no evidence that any adverse action was taken because of his age, Zhou did not suffer an adverse employment action, his allegations are not supported by evidence beyond self-serving speculation and IBM had a legitimate, nondiscriminatory reason for scheduling Zhou as it did. *See* Brief in Support of the IBM Motion at 12. Zhou argues that summary judgment is not appropriate because his IBM managers repeatedly assigned him to more projects than he could feasibly complete in a regular workweek, even after Zhou repeatedly complained of the heavy workload. *See* Resistance at 40-48.

IBM argues that assigning Zhou mainly to patching changes does not constitute an adverse employment action because such assignments "are simply the job responsibilities for which he was hired to do." Brief in Support of the IBM Motion at 12. IBM argues

---

[7] To the extent that Zhou argues that IBM, at some other time, discriminatorily failed to hire him, the court notes that there is no evidence in the record that Zhou applied or expressed interest in such position. In fact, his testimony that he believed he was prohibited from applying for permanent positions at IBM suggests that he never did so.

that such responsibilities do not place Zhou at a disadvantage and, thus, are not adverse employment actions. *Id.* "An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage." *Thomas v. Corwin*, 483 F.3d 516, 528 (8th Cir. 2007) (quoting *Wedow v. City of Kan. City*, 442 F.3d 661, 671 (8th Cir. 2006)). "While '[t]o be 'adverse' the action need not always involve termination or even a decrease in benefits or pay . . . not everything that makes [a plaintiff] unhappy is an actionable adverse action.'" *Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624, 632 (8th Cir. 2016) (alterations in original) (quoting *Sellers v. Deere & Co.*, 791 F.3d 938, 942 (8th Cir. 2015)). IBM admits that, at one point, it reassigned Zhou primarily to patching responsibilities, requiring him to work at night or on weekends when change windows were scheduled. *See, e.g.*, Brief in Support of the IBM Motion at 14. The undesirability of these change windows, and a shift of a plaintiff's primary working hours to those windows could reasonably be viewed as an adverse employment action. *See Kelleher*, 817 F.3d at 631 (recognizing that "[a]n 'increased workload that materially changes an employee's duties can constitute an adverse employment action'" (quoting *Sellers*, 791 F.3d at 944)). At the least, the court concludes that there exists a genuine issue of fact regarding whether Zhou suffered an adverse employment action in his work assignments.

IBM also argues that Zhou cannot demonstrate that similarly situated, younger employees were treated more favorably, and thus he cannot establish a prima facie case of discrimination. *See* Brief in Support of the IBM Motion at 13-14. The court agrees. Zhou advances no additional "facts that give rise to an inference of unlawful . . . discrimination," such as evidence that IBM failed to follow, or even maintained, an official policy regarding work distribution. *Blackwell*, 822 F.3d at 435. Similarly, Zhou has not demonstrated the existence of a similarly situated, younger employee who was treated more favorably.

"[T]he test for determining whether employees are similarly situated to a plaintiff is a rigorous one." *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 956 (8th Cir. 2012) (quoting *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 853 (8th Cir. 2005), *abrogated on other grounds by Torgerson*, 643 F.3d at 1058). In ADEA cases, courts employ the same "similarly situated" standard that is used in race discrimination cases arising under Title VII of the Civil Rights Act of 1964. *See id.* (analyzing both the plaintiff's Title VII claim and ADEA claim under the same framework). A plaintiff must show that he and the employees outside of the protected classification were "similarly situated in all relevant respects." *Id.* at 956 (quoting *Rodgers*, 417 F.3d at 853). The burden of demonstrating that such an employee exists falls on the plaintiff. *See Gilmore v. AT&T*, 319 F.3d 1042, 1046 (8th Cir. 2003). To be similarly situated in all relevant respects, the comparator "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Bone*, 686 F.3d at 956 (quoting *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000)).

Here, Zhou has identified no particular person as a comparator. Instead, he generally asserts that all the other systems administrators were treated more favorably than him, without reference to their age, skill level, the standards to which they were subjected, or any other factor from which the court could draw a comparison. *See Gilmore*, 319 F.3d at 1046. In short, Zhou has failed in his initial burden to produce a similarly situated coworker, not in the protected class, who was treated more favorably than him. However, even if the court were to indulge the assumption that one of Zhou's coworkers was subjected to the same standards, had the same supervisor and was younger than Zhou, Zhou's own assertions would require a finding that he was not similarly situated to his coworkers. Zhou repeatedly states that he possessed the top technical expertise of his team and that he possessed unique skills and knowledge that made him invaluable to Amtrak.

*See, e.g.*, Resistance at 20-24. Accordingly, Zhou cannot establish a prima facie case of discrimination, and IBM is entitled to summary judgment on these claims.

Even if Zhou were able to establish a prima facie case, the court would still find summary judgment appropriate because IBM has offered legitimate and nondiscriminatory reasons for assigning Zhou his workload and Zhou has failed to present evidence that such reasons were pretext for age discrimination. IBM notes that Zhou himself asserts that "he was the most competent system administrator for patching work, and he had specialized knowledge about the Amtrak server environment." Brief in Support of the IBM Motion at 14. IBM further points to evidence that Amtrak requested that Zhou be kept from direct contact with its personnel as much as possible. *See id.* According to IBM, it assigned Zhou to the workload that it did due to these two considerations.

A plaintiff may demonstrate pretext in two ways: (1) he may demonstrate that "the employer's explanation is unworthy of credence . . . because it has no basis in fact" or (2) he may prevail "by persuading the court that a [prohibited] reason more likely motivated the employer." *Hilde*, 777 F.3d at 1004 (alterations in original) (quoting *Torgerson*, 643 F.3d at 1047). "[T]he showing of pretext necessary to survive summary judgment requires more than merely discrediting an employer's asserted reasoning for [taking an adverse employment action]. A plaintiff must also demonstrate that the circumstances permit a reasonable inference of discriminatory animus." *Haigh*, 632 F.3d at 470 (first alteration in original) (quoting *Roeben v. BG Excelsior Ltd. P'ship.*, 545 F.3d 639, 643 (8th Cir. 2008)). In other words, "[t]o prove pretext, a plaintiff must both discredit the employer's asserted reason for termination and show that the circumstances permit drawing the reasonable inference that the real reason" for the adverse employment action was a prohibited one. *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 935 (8th Cir. 2006).

Here, as the court noted above, Zhou himself asserts that he worked primarily on "high level, sophisticated, complicated, and difficult tasks" that previously required

multiple systems administrators to address. *See* Resistance at 20. He also states that, because of that, "he had no chance to work low-level tasks, because the patching tasks are the most difficult jobs [for] the team, and usually no one else [on] the team could take over." *Id.* Zhou provides evidence of the same with several emails and instant messaging conversations wherein others praise him for his work. *See* Zhou Appendix I at 64-69. Such assertions are fatal to Zhou's claim of discrimination. Evidence of Zhou's high level of technical expertise demonstrates that IBM assigned Zhou to higher workloads not out of a discriminatory animus or belief that his lack of job mobility would stifle his complaints, but because of a belief that Zhou was particularly qualified or was efficient enough to perform the work.[8]

Furthermore, IBM has advanced evidence supporting its assertion that Zhou had trouble working with Amtrak. *See, e.g.*, IBM Appendix I at 117 (Thompson affidavit stating that "the relationship lead" with Amtrak "specifically asked [him] to keep . . . Zhou away from the customer as much as possible, for the good of IBM-Amtrak relations"); IBM Appendix I at 143 (Segerstrom affidavit stating that he "had received a number of oral complaints from Amtrak employees about . . . Zhou, all of which were along the lines of 'difficult to work with,' 'rude,' and 'unresponsive in conference calls'" and had been told by two different relationship leads that "they had received complaints about . . . Zhou from the Amtrak personnel with whom they interacted"); IBM Appendix II at 5 (Chumbley affidavit stating that she "had been keeping . . . Zhou primarily assigned

---

[8] Additionally, there is evidence in the record that IBM management attempted to have others help Zhou with patching tasks, but that he was resistant to such help and refused to train others to perform the patching tasks. *See, e.g.*, IBM Appendix II at 78 (email from Majerus to Zhou stressing that Zhou must share information with other team members "so [IBM] can . . . take some of the patching off of [Zhou's] shoulders"); Zhou Appendix I at 46 (email from Zhou to Segerstrom and Majerus stating that he "appreciate[d]" other Amtrak team members' offers to help but stated, "it is not a right time when they don't know where is the starting point").

to patching to keep him from communicating with Amtrak"). Because IBM assigned Zhou primarily to patching assignments out of an effort to minimize Zhou's contact with Amtrak, its motivations were not discriminatory. Zhou argues that, in reality, patching tasks involve more contact with Amtrak personnel, not less. *See* Resistance at 17. However, Zhou does not provide any support for this self-serving statement. *See Anuforo*, 614 F.3d at 807. Accordingly, Zhou has failed to demonstrate pretext by either of the methods outlined in *Hilde*. *See Hilde*, 777 F.3d at 1004.

Finally, the court notes that Zhou has put forth no evidence that, even if IBM's proffered explanations were false, the true reason for its actions were discriminatory. *See Twymon*, 462 F.3d at 935. Zhou admits that, at no point did any person from IBM intimate that he was too old to perform his job duties, make any derogatory comments about his age or mention his age at all when assigning him work. *See* IBM Appendix I at 32-33. Zhou himself never complained to IBM that he believed he was being discriminated against for his age, merely stating that he was being treated "unfairly" in passing. *See id.* at 32; *see also, e.g.*, Zhou Appendix I at 22 (email from Zhou to Majerus with the subject "I feel not be treated fairly"); Zhou Appendix I at 50 (email from Zhou to Majeru stating "It would be unfair if I am required to work [six] days a week and the [seventh] day is set to be a furlough day other than to be my weekend day."). However, the ADEA and the ICRA are not meant to remedy merely unwise or even unfair business choices. Without evidence that Zhou's age was a but-for or motivating cause for his work assignments, even if considered an adverse employment action, the court shall grant summary judgment to IBM on Counts II and VIII.

### 3. *Application for pay raise*

Zhou argues that IBM discriminated against him by artificially classifying him at a low skill level. IBM argues that Zhou cannot bring this claim, because such classification fell outside of the 300-day limitations period imposed by the ADEA and the

ICRA. *See* Brief in Support of the IBM Motion at 15 (citing 20 U.S.C. § 626(d)(1)(B); Iowa Code § 216.15(13)). Zhou does not appear to contest this argument, but merely argues that IBM had the chance, at some point, to raise his pay level but did not do so. *See* Resistance at 15. In any event, Zhou's statement that "every other [system administrator] [o]n the team has at least two technical levels and [payrates] higher than Zhou's" suggests that the allegedly discriminatory treatment was not his initial payrate, but rather stemmed from IBM's later failure to give him a raise in pay.[9] *Id.* at 15. IBM bases its arguments solely on Zhou's application for a pay raise in February of 2014, and Zhou does not appear to argue any other basis for discrimination in Counts III and IX.

IBM argues that it is entitled to summary judgment on this claim because Zhou's age was not a factor in its decision not to give him a raise, Zhou cannot demonstrate any other similarly situated younger contract employee who was given a pay raise and because, even though Artech is the entity that paid Zhou, IBM's decision not to pay Artech more for Zhou's services was supported by legitimate, nondiscriminatory reasons. *See* Brief in Support of the IBM Motion at 15. Zhou argues that he is entitled to summary judgment on this claim because his skills dictate that he should have received a pay raise and the reasons IBM gave for denying him a rate increase do not justify refusing such an increase. *See* Resistance at 24-29.

Even if the court were to accept that Zhou could establish a prima facie case of discrimination, the court would still find that summary judgment in IBM's favor is appropriate because IBM has proffered a legitimate, nondiscriminatory reason and Zhou has failed to demonstrate that such reason is merely pretext for discrimination. Far from satisfying his burden of demonstrating that he is entitled to judgment as a matter of law,

_____

[9] To the extent that Zhou does argue that his initial placement was discriminatory, the court notes that he has advanced no evidence suggesting that such a placement was based in any way on his age.

31

Zhou cannot even demonstrate the existence of a material question of fact regarding his denial of a pay increase. IBM has supported its legitimate nondiscriminatory justification with documentary evidence. In particular, IBM has produced emails between Chumbley, Mattox and an Artech employee discussing the reasons for IBM's decision not to pay Artech more for Zhou's services. *See* IBM Appendix II at 21-27. Such emails demonstrate that Chumbley did indeed value Zhou's technical skills, but expressed concern with the manner in which he communicated with other members of the Amtrak team and the customer. *See id.* Zhou argues that wages are solely meant to compensate an individual for the level of technical skill and work he or she provides to a company, and not on the individual's "character." *See* Resistance at 24-25. He also argues that his communication problems cannot possibly be the reason that IBM chose not to support a rate increase because Chumbley had already taken such problems into consideration when pursuing a potential raise on Zhou's behalf. *See id.* at 28. The court is unconvinced by these arguments. Zhou provides no authority for his argument that wages are solely based on an individual's technical skill. To the contrary, employers are entitled to consider a wide variety of factors in making employment decisions—including whether an individual would work well in a team environment. *See Chambers v. Metro. Prop. & Cas. Ins. Co.*, 351 F.3d at 857-58 (finding an employer's choice not to hire an individual, in part, because an "aggressive interview style" would not "fit well with the team" even though the individual possessed sufficient skills to perform the job was legitimate and permissible).

Chumbley expressed concern about Zhou's ability to work well with his team and the customer—a concern supported by documentary evidence in the record. *See, e.g.*, IBM Appendix I at 149 (email from Segerstrom to Zhou stating that Zhou had "refused to share [his] screen or provide any type of KT other than telling other SA's to *read the help file*" and that "[t]his is not the way to share your expertise or knowledge"); IBM Appendix

II at 78 (email from Majerus to Zhou stating that Majerus did not "know where or why" Zhou formed the belief that patching questions were other systems administrators' issues, and reminding Zhou that they "are a team").  Merely because Chumbley decided to pursue the possibility of pay increase for Zhou, and then ultimately decided against it, does not dictate a finding that such a justification is unworthy of credence.  To the contrary, this fact demonstrates that Chumbley had reservations about paying more for Zhou's services and that such reservations ultimately resulted in the decision not to move forward with the rate increase.  Zhou has failed to point to any evidence in the record that Chumbley's stated reason for denying the rate increase was pretext for discrimination, but instead merely argues that the given reason was not sufficient to justify the denial.  Nor has Zhou advanced any evidence that Chumbley lacked a good faith belief that he was unfit for a pay increase because of his tendency to be argumentative and his communication style.  *See Blackwell*, 822 F.3d at 436 ("[T]he critical inquiry in discrimination cases like this one is not whether the employee actually engaged in the conduct for which he [suffered an adverse employment action], but whether the employer in good faith believed that the employee was guilty of the conduct justifying [such action]." (quoting *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 861-62 (8th Cir. 2009))).

In short, the court finds that Zhou has failed to demonstrate that he is entitled to judgment as a matter of law in his favor.  He has also not demonstrated the existence of a genuine issue of fact regarding whether his age was a but-for or motivating factor in IBM's decision not to pay more for his services.  Accordingly, the court shall grant summary judgment to IBM on Counts III and IX.

### 4.     *Underclaiming of hours*

IBM argues that it is entitled to summary judgment on Zhou's claims that IBM discriminated against him by forcing him to underclaim his hours worked because it urged Zhou to follow its overtime policies.  *See* Brief in Support of the IBM Motion at 16.

Because this issue may be resolved by a finding that IBM did not violate the FLSA, the court shall address such issues together. Only if the court finds that IBM violated the FLSA and was aware that Zhou was underclaiming his overtime hours could the court determine that such a violation was purposeful discrimination. Accordingly, the court shall address Zhou's claims in Counts IV and X below.

## B. FLSA Claim

A plaintiff "who sues for unpaid overtime 'has the burden of proving that he performed work for which he was not properly compensated.'" *Holaway*, 771 F.3d at 1059 (quoting *Anderson*, 328 U.S. at 686-87). The fact that an employee did not actually seek overtime pay is irrelevant in a claim made under the FLSA, because an employee cannot waive his or her entitlement to FLSA benefits. *See Reich v. Stewart*, 121 F.3d 400, 407 (8th Cir. 1997). The general rule is that "[a]n employee must be compensated for duties 'before and after scheduled hours . . . if the employer knows or has reason to believe the employee is continuing to work and the duties are an integral and indispensable part of the employee's principal work activity.'" *Hertz v. Woodbury Cty., Iowa*, 566 F.3d 775, 781 (8th Cir. 2009) (second alteration in original) (quoting *Mumbower v. Callicott*, 526 F.2d 1183, 1188 (8th Cir. 1975)); *see also* 5 C.F.R. § 551.104 ("Suffered or permitted to work means any work performed by an employee for the benefit of an agency . . . provided the employee's supervisor knows or has reason to believe that the work is being performed and has an opportunity to prevent the work from being performed.").

The constructive knowledge rule requires the employer to undertake "reasonable diligence" to determine whether its employees are working in excess of their scheduled hours. *See Hertz*, 566 F.3d at 781. "The FLSA's standard for constructive knowledge in the overtime context is whether the [employer] 'should have known' not whether it could have known." *Id*. at 782. Whether an employer has maintained "an established procedure for overtime claims that [employees] regularly used" can impact the amount of

inquiry required of the employer into potential overtime worked. *See id.* (citing *Newton v. City of Henderson*, 47 F.3d 746, 749 (5th Cir. 1995) ("If we were to hold that [an employer] had constructive knowledge that [an employee] was working overtime because [a supervisor] had the ability to investigate whether or not [the employee] was truthfully filling out the [employer's] payroll forms, we would essentially be stating that the [employer] did not have the right to require an employee to adhere to its procedures for claiming overtime.")). This is so because, "[w]hen the employee fails to follow reasonable time reporting procedures []he prevents the employer from knowing its obligation to compensate the employee and thwarts the employer's ability to comply with the FLSA." *White v. Baptist Mem'l Healthcare Corp.*, 699 F.3d 869, 876 (6th Cir. 2012) (citing *Hertz*, 566 F.3d at 781-82). Furthermore, if an employee "deliberately prevents" an employer from learning of his overtime, the employer cannot be held to have violated the FLSA. *See Brennan v. Qwest Commc'ns Int'l, Inc.*, 727 F. Suppp. 2d 751, 755 (D. Minn. 2010) (citing *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981)).

"For employees subject to the overtime limits of the FLSA, employers are required to keep records of wages and hours." *Holaway*, 771 F.3d at 1059 (citing 29 U.S.C. § 211(c)).

> If an employer has failed to keep records, employees are not denied recovery under the FLSA simply because they cannot prove the precise extent of their uncompensated work. . . . Under this relaxed standard of proof, once the employee has shown work performed for which the employee was not compensated, and sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference, the burden then shifts to the employer to produce evidence to dispute the reasonableness of the inference.

*Id.* (internal quotation marks omitted) (quoting *Carmody v. Kan. City Bd. of Police Comm'rs*, 713 F.3d 401, 406 (8th Cir. 2013)).

Zhou argues that IBM deprived him of overtime compensation in violation of the FLSA. IBM argues that it is entitled to summary judgment on Zhou's FLSA claim because Zhou failed to follow established procedures for reporting overtime, failed to follow his supervisors' directives to claim all overtime that he worked and actively concealed the amount of overtime he was working. *See* Brief in Support of the IBM Motion at 17-22. IBM also argues that it is entitled to summary judgment because Zhou cannot demonstrate the extent of any overtime he worked by a just and reasonable inference because he did not keep contemporaneous records of the time he worked and his vague and bare allegations on that matter are insufficient to justify relief. *See id.* at 22-26. Zhou argues that summary judgment is not appropriate because he repeatedly complained of his workload to his managers and argues that they should have been aware that he worked more than he claimed because of the amount of emails and instant message chats he sent during the daytime hours, when he was assigned patching tasks at night. *See* Resistance at 40-48.

### 1. *Actual or constructive knowledge*

IBM argues that it did not have actual or constructive knowledge that Zhou worked overtime for which he was not compensated because he failed to report such hours, even though "Zhou knew that [IBM's] policy was to claim all of the hours he worked" and that "Zhou's supervisors repeatedly instructed Zhou that he had to claim all of the hours he worked, including overtime hours." Brief in Support of the IBM Motion at 18. It further argues that Zhou failed to follow its policy of using the overtime reporting tool for his purportedly uncompensated hours, despite the fact that Zhou regularly claimed overtime during the disputed period. *Id.* at 18-19. IBM also asserts that Zhou's supervisors "routinely communicated with Zhou to check on the status of his workload, keep track of the hours he had worked, and determine whether Zhou was working overtime hours in a given week." *Id.* at 21. Finally, IBM argues that it did not have constructive knowledge of any overtime Zhou worked because he actively deceived IBM by claiming fewer hours

than he worked when he knew that IBM wanted him to claim all of his hours. *Id.* at 22. Zhou points to several emails in which he complains that his workload was too heavy. *See* Resistance at 40, 45-48. He also identifies the average number of emails and instant messages that he sent during the time period. *Id.* at 41-42. Zhou argues that these messages were sent during the day and that, because the majority of his patching assignments happened overnight, the fact that he participated in chats and responded to emails during the day should have put IBM on notice that he consistently worked overtime. *Id.*

In particular, Zhou draws the court's attention to an email that Zhou wrote to Majerus on March 28, 2014 stating: "Today is the [seventh] day I have worked this week and already pass the [forty] hours limit. I regularly don't have shift and weekend, not just for a period time." Zhou Appendix II at 60. Despite mentioning that he exceeded forty hours that week, Zhou did not claim any overtime. *See* IBM Appendix II at 184. Zhou also cites multiple emails that he claims demonstrate that his supervisors should have known he worked overtime. For example, on April 25, 2014, Zhou wrote the following in an email to Majerus:

> Management should know approximate time for a task and work out a load balance, other than burden on employees to count time for every piece of work. . . . For example, today I already have worked [seven] weeks in a row without a weekend day or any alternative weekend day, and next few weeks are also everyday scheduled. Every night I have average [two] changes and work into morning around [three] o'clock. In order to maximally make customer satisfactions I need to check . . . emails around 8:00 AM since if night changes had problems customer would send me email around this time.

Zhou Appendix I at 23. Zhou argues that IBM managers routinely "say one thing and do another" with respect to overtime requirements, such that their repeatedly telling him he must claim overtime hours as he worked them does not shield them from liability. *See*

Resistance at 8-10, 40. In response, IBM argues that Zhou fails to "explain how those [emails] could have led his supervisors to believe that he was working *more* than" the overtime that he already claimed for those months. *See* Reply at 7.

The court finds that Zhou cannot demonstrate that his managers at IBM knew or should have known the extent to which he worked overtime. To begin, the record is replete with examples of IBM directing Zhou to claim all hours that he worked, with no exceptions. *See* Brief in Support of the IBM Motion at 18; *see also, e.g.*, IBM Appendix II at 29-30, 89. Zhou argues that his managers' statements that "no overtime" was the rule, and their threat to him that he was a contractor and could be replaced anytime was a warning not to claim overtime. However, this contention is contradicted by the record. Initially, the court notes that Zhou cannot have believed that he was generally unable to claim any overtime, even during the times when IBM restricted overtime worked. The record demonstrates that Zhou consistently claimed and received overtime compensation throughout his placement at IBM. *See* IBM Statement of Facts ¶ 90. It is undisputed that Zhou was paid for every overtime hour which he claimed.[10] *See* IBM Appendix I at 41

_____

[10] The only time that Zhou claims he reported all hours worked and was not paid for them was during his last week of employment. *See* Resistance at 41. In particular, he claims that he worked twelve hours on Saturday, February 20, 2016, two hours on Sunday, February 21, 2016 and eight hours on the day he was discharged, Monday, February 22, 2016. *See* Zhou Appendix II at 91. IBM only approved fourteen of the twenty-two total hours he claimed. *Id.* However, such a claim does not properly arise under the FLSA, which sets substantive standards governing overtime pay and minimum wage. *See* 29 U.S.C. §§ 206, 207. The hours Zhou claimed, but alleges he was not paid, were not overtime hours because they did not exceed forty hours for a week. Nor does he allege that he was paid less than minimum wage for such hours. *See* IBM Appendix II at 147 (stating that a workweek "begins at 12:00:01 a.m. Saturday"). Accordingly, a claim for unpaid wages would arise under state law. *See* Iowa Code §§ 91A.3, 91A.7; *see also Guinan v. Boehringer Ingelheim Vetmedica, Inc.*, 803 F. Supp. 2d 984, 994 n.5 (N.D. Iowa 2011) ("A violation of the ["Iowa Wage Payment Collection Law" ("IWPCL")] . . . is not always dependent upon establishing a violation of the FLSA. The specific amount
(continued...)

(Zhou deposition testimony stating that he was "paid for every overtime hour that [he] claimed"). This is true even in the weeks following the meeting with Thompson wherein Thompson stated that "no overtime" was the rule. *See id.* Additionally, IBM has put forth evidence that IBM's policy regarding working overtime was regularly communicated to employees—overtime should not be worked without prior authorization from a supervisor. *See, e.g.*, IBM Appendix I at 131 (email from Thompson to the Amtrak team stating "no [overtime] is to be worked without prior written approval"); IBM Appendix II at 29 (email from Chumbley to Zhou stating "Overtime must be pre-approved before you work it"). Therefore, Zhou's argument that he was precluded from claiming overtime because of IBM's policy or his management's statements does not create a genuine issue of material fact.[11]

Zhou also argues that his supervisors should have been on notice that he underclaimed his overtime because he sent various emails complaining of his workload and he was active on his email and instant messaging system during the daytime hours. The

[10](...continued)
of 'wages due' to employees under the IWPCL must be provided by something other than the IWPCL . . . ., such as an employment agreement or Iowa's minimum wage law." (quoting *Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870, 884 n.9 (N.D. Iowa 2008))). Zhou alleged Count V solely under the FLSA and not under state law. *See* Amended Complaint ¶ 125. In other words, because Zhou's claim for the eight hours for which he seeks payment does not derive from the FLSA, no federal claim exists and Zhou cannot pursue such claim in this action for failure to plead the same.

[11] Furthermore, Zhou's argument that he did not claim overtime because he feared for his job does not demonstrate a violation of the FLSA. Zhou does not allege that he was retaliated against in any way for claiming the overtime that he did. *See* IBM Appendix I at 82. His subjective belief that he would have been reprimanded had he claimed all the overtime that he purportedly worked, without supporting evidence, is insufficient to raise a genuine issue of material fact regarding whether IBM violated the FLSA. IBM does not violate the FLSA by terminating an employee who cannot accomplish all of his assigned tasks during his regular working hours. Such termination would be motivated by the employee's inefficiency, rather than to skirt its duties under the FLSA.

court also finds that these arguments fail to raise a genuine issue of material fact. Zhou's consistent complaints of being overworked do not necessarily require a finding that Zhou worked more overtime than he claimed. To accept Zhou's proposition, the court would be required to assume that IBM knew that Zhou worked all night, that he failed to claim his daytime hours or some of his nighttime hours on his timesheets and that his supervisors would be able to detect the time periods when he worked and was not compensated. *See Roberts v. Advocate Health Care*, 119 F. Supp. 3d 852, 861-64 (N.D. Ill. 2015) (finding that an employee's allegation that her employer should have known she was working overtime due to her attendance at staff meetings and working through lunch to be without merit because it rested on assumptions). These assumptions are unsupported by the record. To begin, Zhou's managers have testified, and Zhou himself appears to recognize, that they are not technical experts and do not know how long certain assignments should be taking him. *See* IBM Appendix II at 7 (Chumbley affidavit stating that she does "not have the technical expertise to know if too much or too little work has been scheduled to fit in a [forty] hour week"); IBM Appendix II at 29 (email from Chumbley to Zhou stating "I want you to tell us if we are scheduling you for too much work"); *see also* Resistance at 12-13. Additionally, Zhou has failed to produce evidence to suggest that his managers could have known how many hours he worked per evening aside from the hours he reports on his timesheets. *See* IBM Appendix I at 78 (Zhou deposition testimony that Chumbley "would never know" that he worked more than forty hours a week unless he informed her); IBM Appendix I at 119 (Thompson affidavit stating that he could have no knowledge of the hours an employee worked remotely or after hours); IBM Appendix I at 141 (Segerstrom affidavit stating that he relied on employees to accurately report hours because he could not know the hours an employee worked remotely or overnight); IBM Appendix II at 7 (Chumbley affidavit stating that she relies on employees to accurately report hours);

IBM Appendix II at 29 (email from Chumbley to Zhou that she "cannot keep track of how many hours everyone on the team has spent").

Additionally, Zhou's argument is flawed because it is based on the premise that emails, not accompanying his timesheets, and statistical evidence of his activity during the day shift, are sufficient to demonstrate a genuine issue of fact regarding whether IBM should have known that he worked overtime for which he was not compensated. Zhou effectively argues that IBM must be expected to intuit, from Zhou's online activity, that he worked hours above and beyond what he reported. As the Eighth Circuit noted in *Hertz*, an employer is not required to undertake extraordinary measures to determine whether its employees work overtime for which they are not compensated and the standard is not whether an employer *could have* known, but rather if it *should have* known. *See Hertz*, 566 F.3d at 781-82 (refusing to find that forms tracking officers' status from the moment they go on duty to the time they are relieved gave their employers constructive notice that they were working overtime because it would not be reasonable to require the employer to "weed through non-payroll . . . records to determine whether or not its employees were working beyond their scheduled hours"); *see also Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 965 (5th Cir. 2016) (holding that "computer usage reports" did not place an employer on notice that an employee was working uncompensated overtime when the employee refused to utilize the employer's established method of reporting overtime).

Here, IBM has maintained a specific tool for reporting regular and overtime hours, which Zhou consistently used to claim overtime. This diminishes the burden placed on IBM to inquire into the hours that Zhou alleges that he worked. *See Hertz*, 566 F.3d at 782; *see also White*, 699 F.3d at 876. Furthermore, the evidence demonstrates that IBM did make inquiries into Zhou's hours, and found that Zhou was concealing the hours he truly worked from IBM. *See, e.g.*, IBM Appendix II at 38, 44, 65, 99, 107. Emblematic

of this issue is the instant message conversation between Majerus and Zhou on May 8, 2014, wherein Majerus confronted Zhou, stating that she knew he had worked multiple days in a row and that she knew he must have worked more than he was claiming. *Id.* at 95. It was only after she did so that Zhou admitted the total number of hours he had worked. *Id.* IBM attempted to correct this action multiple times. *See, e.g.*, *id.* at 29-30 (emails from Chumbley to Zhou stating that she had been made aware that he had worked more than forty hours the previous week and reiterated that she wanted Zhou to claim all hours); *id.* at 32 (email from Chumbley to Lynch asking Lynch to affirm Zhou's understanding of IBM's policy because Zhou kept "saying he's willing to work without claiming and I want to make sure he knows that I don't want him to do that"); *id.* at 95 (instant message conversation between Majerus and Zhou in which she approves overtime for him after coaxing him to admit the total number of hours he worked stating, "[t]hats [sic] how you are supposed to do it" and reiterating that "[i]ts [sic] very important to do it correctly").

Furthermore, Zhou has advanced no evidence suggesting that IBM should have known he worked hours in addition to those he regularly claimed. Neither party has provided detailed time records with starting and stopping times—rather, such time records merely record the total hours worked each week. *See* IBM Appendix II at 181-95. Zhou does not demonstrate how IBM managers should have known his daytime emails and chats were not included in his reported hours but merely argues that they should have been aware of how long his assignments took him to complete. In light of the absence of evidence supporting Zhou's proposition, the court concludes that Zhou has failed to raise a genuine issue of material fact regarding whether IBM undertook sufficiently "reasonable diligence" or "should have known" that he worked overtime for which he was not compensated. To require IBM to painstakingly wade through emails between itself and Zhou, which do no more than raise the possibility that he was being overworked, or to

compare email and instant message responses to Zhou's timesheets, would be to relieve Zhou of his responsibility to comply with his employer's policies regarding the reporting of overtime. The law is clear that this is not required. Zhou's arguments amount to nothing more than suggestions that IBM could have determined that he was working more overtime than he was claiming, but they do not demonstrate that IBM should have known as much. There is no evidence that IBM actually encouraged Zhou to under-report his hours. The only documentary, objective evidence in the record demonstrates the exact opposite. Zhou's self-serving, conclusory statements to the contrary are insufficient to defeat summary judgment. *See Anuforo*, 614 F.3d at 807. Accordingly, the court shall grant summary judgment on Count V.

### 2.  *Just and reasonable inference*

Even if Zhou was able to demonstrate that he worked time for which he was not compensated, the court would still find summary judgment to be appropriate. Zhou cannot demonstrate the amount of uncompensated work as a matter of just and reasonable inference. As an initial matter, the court notes that Zhou has not alleged that IBM has failed to keep records and time sheets as required by the FLSA. *See* 29 U.S.C. § 211(c). Such time sheets are the best evidence of overtime worked. However, even if IBM had failed to keep time records, or such records were insufficient, triggering the relaxed evidentiary standard, the court would still find that summary judgment in IBM's favor is appropriate.

In his deposition, Zhou admitted that he did not keep notes contemporaneously as he worked, and also admitted that he has no notes or any other objective evidence demonstrating the amount of overtime that he worked. *See* IBM Appendix I at 38. The record is also unclear as to how often he allegedly worked overtime without claiming it, and how often he merely claimed less overtime than he worked. *Compare, e.g.*, IBM Appendix II at 88 (email from Zhou to Majerus stating that he had "never over claim[ed]

hours" and he always "simply" claimed eight hours a day, even if he was working more),

*with* IBM Appendix I at 82-83 (Zhou deposition testimony stating that, when he did claim

overtime, he would normally claim about half of what he actually worked). Thus, there

is no evidence in the record by which a fact finder could calculate a measure of hours

worked without compensation as a matter of just and reasonable inference.

Nevertheless, Zhou testified during his deposition that he routinely worked twice

as many overtime hours as he actually claimed. Even accepting Zhou's calculation

method, the court would still find such method to be insufficient. To begin, at his

deposition, Zhou testified as follows:

> Q.     . . . I asked you how many hours you worked that
> week. And is or . . . your answer is you don't know
> because its too — it's impossible to determine? How
> many hours did you work that week is my question.
>
> A.     Normally I claim just half overtime, so suppose should
> be — if I claim [thirty] hours, I think really overtime
> should be [sixty] hours.
>
> . . .
>
> Q.     So are you saying that . . . after Mr. Segerstrom
> became you first-line manager . . . that you claimed
> overtime but you only claimed half of—
>
> A.     Yes.
>
> Q.     — the overtime?
>
> A.     About this. Not exactly.

IBM Appendix I at 83. Therefore, the only method that Zhou puts forth to demonstrate

the extent of uncompensated time worked is based on mere approximation and Zhou admits

that it was not consistently applied. Without any evidence that Zhou employed this method

with any more regularity than "[n]ormally," the court cannot conclude that a jury could

find, as a matter of just and reasonable inference, an amount of hours that Zhou worked

but for which he was not compensated. *Id.* at 83. Zhou's contentions are unsupported by

anything but his own self-serving statements, which in turn are unsupported by any evidence in the record. *See Holaway*, 771 F.3d at 1059-60 (holding that a plaintiff had not proven the extent of uncompensated hours by a just and reasonable inference where the basis for such claim was mere estimation, based on bare, contradictory assertions and where the plaintiff provided only vague testimony without reference to specific days and hours worked); *see also Melton v. Tippecanoe Cty.*, 838 F.3d 814, 818-19 (7th Cir. 2016) (noting that, where an FLSA plaintiff did not "designate any evidence to support his claim" that he was periodically forced to work through part or all of his lunch break, "did [not] rely on his own spreadsheet [of hours worked] as evidence of his unpaid lunch hours" and the source of the spreadsheet itself was based on the employee's "own memory," he could not prove the amount of overtime worked as a matter of just and reasonable inference). Accordingly, the court finds that this is a separate basis to grant summary judgment to IBM on Count V. Because the court finds that summary judgment is appropriate on multiple grounds, it declines to address whether IBM's alleged violation of the FLSA was "willful." *See* Resistance at 29-30.

### 3.    *Age discrimination*

Finally, because Zhou has failed to demonstrate that IBM knew or should have known that he worked overtime, the court shall also grant summary judgment to IBM on Counts IV and X—Zhou's claims that he was discriminated against with respect to his overtime compensation. Without sufficient evidence demonstrating that IBM was or should have been on notice that Zhou worked more overtime than he claimed, there is no evidence to suggest that IBM "forced" him to underclaim his hours due to his age. Furthermore, Zhou has failed to put forth any evidence to suggest that IBM's actions in limiting the amount of overtime hours he worked and subsequently claimed was motivated by his age rather than an attempt to control costs, as IBM argues. *See, e.g.*, IBM Statement of Facts ¶ 76. Even assuming that Zhou was correct that IBM managers "said

one thing but did another," Zhou has advanced no evidence that they treated him differently than any other employee, and such a contention is flatly contradicted by the record. *See* IBM Appendix II at 35 (email from Majerus to Zhou and several other contractors stating IBM's overtime policy and stressing that employees must get preapproval before working overtime). Thus, even IBM's communicated restrictions on overtime, construed by Zhou as a strict prohibition on claiming overtime, was not discriminatory. Accordingly, the court shall also grant the IBM Motion with respect to Counts IV and X.

## *C. Retaliation*

Both the ADEA and the ICRA make it unlawful for an employer to retaliate against an individual for making or participating in a charge of discrimination. *See* 29 U.S.C. § 623(d); Iowa Code § 216.11(2). Courts generally apply identical analyses to retaliation cases arising from the ADEA and the ICRA. *See Young-Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 912 (8th Cir. 2011) ("This court analyzes ICRA claims under the same method as federal retaliation claims." (quoting *Smith v. Allen Health Sys.*, 302 F.3d 827, 836 (8th Cir. 2002))).

In order to prevail on a claim for retaliation under the ADEA and the ICRA, a plaintiff must demonstrate: (1) he engaged in protected activity; (2) the employer treated him in a way that was materially adverse; and (3) there was a causal connection between the two. *See Betz v. Chertoff*, 578 F.3d 929, 937 (8th Cir. 2009); *see also Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1043 (8th Cir. 2007). "The timing of an adverse employment action in connection with the protected activity 'can sometimes establish causation for [the] purpose of establishing a prima facie case.'" *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 915 (8th Cir. 2006) (quoting *Sherman v. Runyon*, 235 F.3d 406, 410 (8th Cir. 2000)). "However, [temporal] proximity alone is insufficient to establish pretext." *Gibson v. Geithner*, 776 F.3d 536, 542 (8th Cir.

2015). "Rather, [courts] evaluate 'the timing of the discharge . . . in light of other evidence, or lack of other evidence, in the record.'" *Id.* (second alteration in original) (quoting *Sherman*, 235 F.3d at 410). "An inference of a causal connection between a charge of discrimination and termination can be drawn from the timing of the two events, but in general more than a temporal connection is required to present a genuine factual issue on retaliation." *Green*, 459 F.3d at 915 (8th Cir. 2006) (quoting *Peterson v. Scott Cty.*, 406 F.3d 515, 524 (8th Cir. 2005), *abrogated on other grounds by Torgerson*, 643 F.3d at 1031). A plaintiff may sever the causal inference created by a close temporal proximity between the protected activity and adverse employment action by engaging in "intervening unprotected conduct" that serves as the true reason for the adverse action. *Green*, 459 F.3d at 915 (quoting *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999)).

IBM argues that it is entitled to summary judgment on Zhou's claim of retaliation because there is no evidence of a causal link between any protected activity and Zhou's removal from IBM.[12] *See* Brief in Support of the IBM Motion at 28-29; Reply at 9. IBM further argues that summary judgment is appropriate because it has advanced a legitimate nondiscriminatory reason for requesting that Artech remove Zhou from his placement at IBM—namely, that Zhou became argumentative with an Amtrak representative, Enszer, during one of his patching changes. *See* Brief in Support of the IBM Motion at 29-31. Zhou argues that he is entitled to summary judgment on his retaliation claims because Segerstrom did not inquire as to his version of events before recommending that Zhou be removed from IBM, Zhou was still on IBM's schedule for the weeks following the incident

---

[12] The court notes that Zhou was not technically terminated when IBM requested that Artech remove him from his placement at IBM. However, because IBM does not argue that it's request to remove Zhou was not an adverse action, and because there exists at least a genuine issue of fact regarding whether his removal from IBM was an adverse action, the court shall not grant summary judgment on these grounds.

with Enszer, Segerstrom did not have a good faith belief that Zhou had argued with Enszer and Segerstrom has shifted his justification for requesting that Artech remove Zhou from IBM throughout the course of this litigation. *See* Resistance at 30-38. Zhou argues that Segerstrom was instructed by some "manager whose level is higher than first line manager" to seek his removal out of retaliation for filing the instant suit. *See id.* at 33-34.

Initially, the court notes that Zhou alleged that IBM retaliated against him for filing his initial disclosures in the instant action in his Amended Complaint, but later changed his argument to assert that it was the filing of the instant action that was the genesis of his removal from IBM in the Resistance. *Compare* Amended Complaint ¶¶ 93-100, *with* Resistance at 31 ("Plaintiff has found that the event of delivering Plaintiff's Initial Disclosure had not played the important role as initially thought . . . ."). The court finds that, under either situation, summary judgment in favor of IBM is appropriate.

Premising Zhou's argument on the filing of the instant action, the court concludes that Zhou has failed to establish a prima facie case of retaliation. The original Complaint (docket no. 1) in this action was filed on August 17, 2015. Zhou was not removed from his IBM assignment until February 22, 2016, over six months later. Courts have recognized that a six month interval is insufficient to prove causation. *See Fercello v. Cty. of Ramsey*, 612 F.3d 1069, 1080 (8th Cir. 2010) (collecting cases and noting that a sixth month gap between protected activity and adverse employment action "eliminates [the plaintiff's] ability to prove causation based on temporal proximity"). Accordingly, the court must "look to other indicators of causation, and do so in light of a significant time gap." *Id.* Zhou has advanced no other evidence of causation between his initiation of the instant action and his removal from IBM, instead attacking IBM's proffered legitimate, nondiscriminatory reason for such removal. *See* Resistance at 31. Assuming, without deciding, that Zhou's service of his initial disclosures constitutes protected activity, the court finds that at least a genuine issue of fact exists regarding whether his service of the

same was causally related to his removal from IBM. The Eighth Circuit has noted that two weeks is sufficiently close in time to justify an inference of causation. *See Smith*, 302 F.3d at 833 (noting that the prima facie case stage of the *McDonnell Douglas* "requires only a minimal showing before requiring the employer to explain its actions"). Here, Zhou served his initial disclosures on February 19, 2016 and was removed from IBM's account on February 22, 2016. The temporal proximity between the events is sufficient to establish a prima facie case of retaliation.

Moving to the second step of the *McDonnell Douglas* analysis, IBM has advanced a legitimate, nondiscriminatory reason for seeking Zhou's removal—namely, the February 12, 2016 incident with Enszer. *See* Brief in Support of the Motion at 29-31. Accordingly, the burden shifts back to Zhou to demonstrate that such justification is pretextual. The court finds that Zhou cannot do so.

Zhou argues that IBM's failure to inquire into his side of the dispute with Enszer demonstrates that IBM's reasons were pretext. Zhou further argues that the argument with Enszer "is a minor issue and . . . far from rising to the level of discharging a veteran engineer without inquiring" into what occurred. Resistance at 30-31. However, the evidence in the record demonstrates that Segerstrom viewed the incident as serious. Segerstrom received emails from both Enszer and Gardiner regarding the incident. *See* IBM Appendix I at 164; IBM Supplemental Appendix at 53. When Segerstrom responded to Enszer regarding the incident, he stated that what Enszer was describing sounded "beyond the norm" for Zhou's behavior. Zhou Appendix I at 83. This was not the first time that Zhou's superiors had noted that he had a difficult time communicating appropriately with customers and management. *See* IBM Appendix II at 21 (email from Chumbley to Mattox stating that Zhou has "communication problems" and sometimes "com[es] across as argumentative with the customer"); Zhou Appendix II at 112 (email from an Artech representative to Zhou stating that Zhou was "being argumentative with

the customer and the new manager . . . Chumbley"); IBM Appendix I at 143 (Segerstrom affidavit stating that he had previously received "oral complaints" from Amtrak employees describing Zhou as being difficult to work with). In light of the emails from Enszer and Gardiner and Segerstrom's opinion that Zhou could come across as difficult and rude with customers, the court does not view Segerstrom's failure to inquire into Zhou's version of events as raising a genuine issue of fact regarding pretext. Zhou has produced no evidence suggesting that Segerstrom's belief that Zhou engaged in conduct "beyond the norm" with Enszer, or that he had been difficult to work with in the past, was not held in good faith. *See Blackwell*, 822 F.3d at 436. It does not matter whether Zhou, in fact, crossed some line in terms of his conduct. Without evidence suggesting that Segerstrom lacked an honest belief that he did, the court finds that Zhou has not demonstrated that his removal was pretext for retaliation for either filing the instant action or serving his initial disclosures.[13]

Zhou argues that IBM's treatment of Aaron Bouzek, a former IBM employee who was discharged after being arrested for various child sex crimes, demonstrates that IBM's reasoning is pretext. *See* Resistance at 31; Zhou Appendix II at 100. Zhou asserts that he and another systems administrator informed IBM in early 2014 that Bouzek was "intentionally making systems unstable and creating problems on Amtrak servers." Resistance at 31. Zhou argues that, because Bouzek was not fired at that time, only later after being arrested, the two were treated differently for similar actions, drawing the inference of pretext. In the retaliation context, a plaintiff may establish pretext by comparing him or herself to a similarly situated employee who did not engage in protected conduct and was treated more favorably. *See Smith*, 302 F.3d at 835. The similarly

---

[13] Furthermore, the court notes that the argument with Enszer occurred on February 12, 2016, seven days prior to Zhou's service of his initial disclosures. This further weakens the inference of pretext because it suggests that Segerstrom made the decision to seek Zhou's removal before Zhou even served his initial disclosures.

situated employee analysis is the same as in ADEA discrimination claims. *See id.* Here, Bouzek and Zhou were not similarly situated in all relevant respects. To begin, Zhou complained about Bouzek to management as a fellow co-worker. In Zhou's case, he was removed from his placement at IBM because of a customer complaint. This alone is sufficient to conclude that Zhou and Bouzek were not similarly situated. Furthermore, there is evidence in the record that IBM managers viewed Zhou as being argumentative and difficult to work with since at least 2014, when Zhou requested a pay increase. *See* IBM Appendix II at 21 (email from Chumbley to Mattox stating that Zhou has "communication problems" and sometimes "com[es] across as argumentative with the customer"); *see also* Zhou Appendix I at 83 (email from Segerstrom to Enszer stating that Zhou "has always had what seems to be almost rude behavior but that has just been his communication style and his intent was never to be rude"). Zhou has advanced no evidence that Bouzek had such a history. Accordingly, the court cannot conclude that Zhou and Bouzek were similarly situated.

Zhou also variously argues that IBM's reasoning for seeking his removal is pretext because Zhou was technically correct during his discussion with Enszer and because Segerstrom has shifted his justification for Zhou's termination.[14] *See* Resistance at 33, 37. Neither of these arguments are meritorious. Zhou was not removed for giving Amtrak incorrect technical advice, he was removed for the manner in which he communicated with Enszer. IBM's justification for seeking his removal does not succeed or fail on whether he was correct in his assessment of the Amtrak server. There is also no evidence that Segerstrom or IBM have shifted their justification for seeking Zhou's removal at any point

---

[14] Zhou also suggests that IBM's resistance to his discovery attempts demonstrates pretext. The court will not address or consider such argument. The court has consistently warned Zhou that he must file motions to compel if he feels that IBM is abusing the discovery process. Zhou has consistently failed to do so. The court shall not deny IBM summary judgment or grant Zhou summary judgment on these grounds.

during the course of litigation. *Compare* Zhou Appendix I at 96 (email from an Artech representative to Zhou on April 22, 2016 stating that "[t]he immediate reason that IBM requested that you be taken off the account ending your assignment was due to a complaint that IBM received from Warren Enszer of Amtrak on February 12, 2016"), *with* Brief in Support of the Motion at 29-30. Finally, Zhou argues that Segerstrom was not the person who suggested or requested Zhou be removed from the account. *See* Resistance 34-35. He does not support this argument with any evidence of who made the decision to remove him from his placement at IBM or any other evidence allowing the court to infer causation. Rather, he makes vague reference to the fact that he was scheduled for work and that Segerstrom had requested login data for him for some of IBM's new servers, arguing that this demonstrates that Segerstrom was not planning on terminating him. *See* Resistance at 34. This is insufficient to demonstrate that IBM's justification was pretext. Vague, conclusory allegations are insufficient to defeat summary judgment. *See Anuforo*, 614 F.3d at 807. Zhou fails to put forth evidence to suggest that Segerstrom would not have taken those actions had he actually made the decision to request Zhou's removal, or demonstrate that such actions were not taken when other employees were terminated or removed in the past.

In short, Zhou cannot establish a prima facie case of retaliation based on his filing of the instant action. Even if he could, however, the lack of temporal proximity, along with weak evidence supporting a prima facie case, fails to raise a genuine issue of fact regarding pretext. Although Zhou can establish a prima facie case of retaliation based on his service of his initial disclosures, he cannot establish the existence of a genuine dispute of material fact in light of IBM's legitimate, nondiscriminatory reason for seeking his removal. Therefore, Zhou has also failed to demonstrate that he is entitled to judgment as a matter of law on his retaliation claims. The court shall grant summary judgment in IBM's favor on Counts III and IX.

### VII.  CONCLUSION

In light of the foregoing, the IBM Motion (docket no. 102) is **GRANTED** and the Resistance (docket no. 121) is **DENIED**.  The Clerk of Court is **DIRECTED** to enter judgment in accordance with the above findings.  The trial date is vacated.

**IT IS SO ORDERED.**

**DATED** this 31st day of March, 2017.

LINDA R. READE, JUDGE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA